POTVIN *v.* WEST BAY CITY SHIPBUILDING CO.

1. EVIDENCE—EXPERT TESTIMONY—COMPETENCY.
   A witness experienced in metallurgical analysis is competent to give expert testimony in respect to the condition of an alleged defective tool, as shown by a subsequent chemical analysis and microscopical examination.

2. MASTER AND SERVANT—PERSONAL INJURIES—DEFECTIVE TOOLS—EVIDENCE — ASSUMED RISKS — NEGLIGENCE — CONTRIBUTORY NEGLIGENCE—QUESTIONS FOR JURY.
   Plaintiff was injured by a chip flying from a hammer, known as a "softhead," when struck by a riveting hammer, resulting in the loss of an eye. The "softhead" was made from a riveting hammer by taking the temper from one end. The testimony in plaintiff's behalf tended to prove a defect in its construction by reason of temper being left in the soft end, while that of defendant tended to prove that it was properly made in the first instance, but had become hardened and crystallized by use. *Held*, that the questions of whether or not it was a safe tool when furnished, whether plaintiff assumed the risk of his employment, or whether he was guilty of contributory negligence, were for the jury.

3. DAMAGES — PERSONAL INJURIES — IMPAIRMENT OF EARNING CAPACITY—EXCESSIVE VERDICT—QUESTION FOR JURY.
   Whether the continuance of plaintiff in the employment in which he was engaged at the time of his injury disproves the testimony of himself and his physician that the loss of an eye affected his ability to do his work, was properly submitted to the jury; and, aside from a diminution of earning power, a verdict of $3,682 is not excessive compensation for such loss.

4. MASTER AND SERVANT—PERSONAL INJURIES—DUTY OF MASTER—NEGLIGENCE—INSTRUCTIONS—HARMLESS ERROR.
   Where, in such action, it appeared that defendant manufactured the tools furnished to its employés—its duty to furnish safe tools being absolute and nondelegable—and plaintiff's entire claim rested upon the proposition that defendant's blacksmith left temper in the "softhead," which was the proximate cause of the injury, and such act being conceded to be negligent if it occurred, the verdict of the jury established defendant's negligence; and the action of the

trial court in withdrawing a portion of the charge that "defendant did not owe plaintiff the duty of furnishing a reasonably safe tool, but only the duty to use reasonable care to furnish a reasonably safe tool," if erroneous, was not prejudicial to defendant.

5. EVIDENCE—ADMISSIBILITY.

The admission in evidence of tools and photographs of microscopical enlargements of sections thereof was permissible to explain and illustrate the testimony of the expert and to enable the jury to understand the character of such tests and the basis of the expert's opinion; the trial court in the charge fully protecting the defendant against harmful inferences that might be drawn from a comparison of the exhibits.

6. APPEAL AND ERROR—HARMLESS ERROR — OPINION EVIDENCE— ADMISSIBILITY—INSTRUCTIONS.

The admission of opinion evidence by one incompetent to so testify was cured by the giving of a requested instruction directing the jury to disregard it; and it will not be inferred that the jury were affected by the admission of similar testimony which was not called to the attention of the court.

Error to Bay; Collins, J.   Submitted January 6, 1909. (Docket No. 10.)   Decided April 30, 1909.

Case by Maxim Potvin against the West Bay City Shipbuilding Company for personal injuries.   There was judgment for plaintiff, and defendant brings error. Affirmed.

*Gillett & Clark*, for appellant.

*F. W. De Foe*, for appellee.

BLAIR, C. J.   Action to recover damages for the loss of plaintiff's eye, alleged to have been the result of defendant's negligence in furnishing an unsafe tool to plaintiff for his use in riveting.   At the time of his injury, plaintiff, a riveter of many years' experience, was engaged with two others in riveting, by hand, steel plates used in the construction of a steel ship.   Bloom, one of plaintiff's gang, was holding a heavy hammer against the

head of a rivet. Zybach, another member, was holding the hard face of a tool known as a "softhead" against the point of the rivet, and plaintiff was striking the softhead with a riveting hammer. As a result of plaintiff's blow, a small piece of steel flew from near the center of the top of the softhead, struck plaintiff's right eye, and destroyed the sight thereof.

The defendant manufactured the softheads used by the riveters, employing a blacksmith for that purpose, among others. The softhead was manufactured hard in one end and soft in the other, for the one using the riveting hammer to strike against. The softhead in question was manufactured from a riveting hammer. In making a riveting hammer, both ends are tempered and the eye is left soft.

"*Q.* So what would have to be done with the hammer before it would be fit for a softhead?

"*A.* Have it sent to the blacksmith shop and have it annealed. By annealing I mean softening. Taking all of the temper out of a piece of metal. You would heat it in the fire cherry red. Suppose you didn't have to cut off either end, but all you had to do was to take the temper out, you would just heat it up to a cherry red and throw it down. You would not have to heat the other end at all to take the temper out of that end. I would not reheat the whole tool.

"*Q.* If the blacksmith, when he heated that, did not heat it hot enough, and then he threw it down, there would be some temper left in it?

"*A.* If he didn't heat it hot enough, certainly the temper would be there just the same.

"*Q.* And if he left any temper in it, of course, in that way, it would not be a fit tool to be used as a softhead?

"*A.* No, sir."

The negligence alleged and sought to be proved by plaintiff was that defendant's blacksmith, who manufactured the softhead out of the riveting hammer, either put or left temper in the end which should have been soft. The case was submitted to the jury, who rendered a verdict in favor of plaintiff for $3,682.23. Defendant brings

the record to this court for review upon writ of error. The following is a synopsis of the errors relied upon:

" (1) The court should have directed a verdict for defendant: (*a*) Because there was no competent evidence to show that the softhead, as manufactured and furnished, was not reasonably safe. (*b*) Because there was no competent evidence to show that the hardness referred to by the expert witness Zimmerschied was the proximate cause of the injury. (*c*) Because there was no competent evidence to connect the condition of the tool with any actionable negligence on the part of the defendant. (*d*) Because the risk was assumed. (*e*) Because plaintiff was guilty of contributory negligence.

" (2) The court should have granted defendant's motion for a new trial on the ground that the verdict was excessive and against the weight of the evidence.

" (3) The court should have charged, as requested, that there was no competent evidence of any impairment of plaintiff's earning capacity.

" (4) Prejudicial statements of plaintiff's counsel.

" (5) The error of the trial judge in defining the limits of defendant's duty.

" (6) Admitting evidence of the comparative hardness of Exhibit A and other tools.

" (7) The admission of opinion evidence on questions that should have been left to the jury.

" (8) The admission of the opinion evidence of the witness Zimmerschied on matters in respect to which he was not qualified.

" (9) The admission of opinion evidence of plaintiff and Zybach.

" (10) Miscellaneous errors in connection with the charge and requests to charge.

" (11) Miscellaneous errors in the admission of evidence."

1. The important question presented by the record is whether the blacksmith who manufactured the softhead out of the riveting hammer put or left temper in the soft end thereof. The testimony of defendant's witnesses tended to show that:

" There ought to be no temper at all in the head of the softhead. If a man should make a softhead and put

some temper in the head of it, that would not be a properly made tool.

"*Q.* And if the temper was put in the head of it, it would not be a safe tool either, would it ?

"*A.* No, sir; a man would be foolish to do it.

"*Q.* Why wouldn't that tool be safe to use if there was temper in it ?

"*A.* Simply because it is dangerous. There would be danger of losing an eye. Piece might fly from it; get a piece in your hand, arm, or body.

"*Q.* When making a tool such as that, which is the harder thing to do, to get the right temper here in the face of the tool, or to leave the other end soft ?

"*A.* Temper the face. That is where the fine part of the blacksmith's work comes in. We always leave the temper out of the other end. That is natural work.

"*Q.* You can always do that in making a tool like this; you can always work it so as to leave the temper out of the soft end of it ?

"*A.* Yes, sir.

"*Q.* There is no necessity of putting any temper, and no reason why you should at all ?

"*A.* No, sir."

Defendant's testimony further tended to show that the softhead in question had no temper in the soft end, and appeared to be and was a safe tool for a man to work with.

"*Q.* So you would not blame a riveter for taking the tool if the toolman handed him this tool and he went to work with it ?

"*A.* No, sir.

"*Q.* He would be justified in using it ?

"*A.* Yes, sir."

Defendant's witnesses, in the main, were blacksmiths of long experience in the making of such tools, but without experience in the chemical analysis or microscopical examination of steel.

The sole witness to sustain the plaintiff's allegation of negligence was Mr. K. W. Zimmerschied, an instructor in metallurgy and qualitative analysis in the State University. Prof. Campbell has charge of the department, but owing to blindness is not able to do the actual work,

and, as an instructor in his department, Mr. Zimmer-schied does "practically all the metallurgical analysis and all of the microscopic work along metallurgical lines." We regard the testimony of Mr. Zimmerschied as fully establishing his competency and qualifications to testify as an expert concerning the condition of the soft-head in question. Having testified as to the chemical analysis and microscopical examination made by him, he testified that the temper or hardness had not been sufficiently removed from the soft end of the tool in question; that the tool was not properly made in the first instance, but was subjected to improper heat treatment.

"*Q.* With reference to Exhibit A, I wish you would state whether or not the degree of hardness that you found in the head of that tool could have been produced by long-continued use, such as hammering or striking upon the head?

"*A.* The condition of hardness?

"*Q.* Yes, the excess of hardness.

"*A.* The condition found could not have been produced by long-continued striking upon the head.

"*Q.* And when must that condition have been produced?

"*A.* It must have been produced during the heat treatment of the tool."

With reference to the chemical analysis, the witness testified that the carbon present was the ordinary percentage, but the phosphorus was "slightly above the amount that should be present;" but the excess was not serious, and "a competent blacksmith could make a reasonably safe tool from that material."

"*Q.* You assume that certain conditions of cooling were present, and you assumed that from the microscopic examination? That test is not absolutely infallible, is it? I mean by that, that you cannot tell beyond a doubt that the tool maker in making that tool treated it as you suppose he treated it, from your examination?

"*A.* I can tell beyond a doubt that the conditions of cooling were certain; as to whether he plunged it into water, the way of it, exactly in what way, I am not able to tell, or that he used water instead of brine, but the rate of cooling can be determined beyond a doubt."

If chipping was due to the chemical composition of the metal or the heat treatment, he testified that it would be just as likely to occur the first day as afterwards.

The essence of Mr. Zimmerschied's testimony was that, by tests which admitted of no doubt as to the result, he had determined that there was temper left in the softhead by the blacksmith who manufactured it. This, under the testimony of defendant's witnesses, was competent proof of, and, if believed, a demonstration of, defendant's negligence. The testimony of defendant's witnesses tended to show that the tool was properly made in the first instance and safe when used; that the steel in the softhead, from continual hammering, would crystallize and harden and scales would form, which, by being struck with the edge of the hammer, would fly off. This was directly opposed to the testimony of Mr. Zimmerschied, and it was for the jury to say which line of testimony was correct.

In view of the testimony of defendant's expert witness Hennessy, that the very thing might happen which did happen, if temper were left in the softhead, and the testimony of Zimmerschied that long-continued hammering would make no difference, we do not understand how it can be contended that the evidence did not tend to show that the temper was the proximate cause of the injury. Neither, in view of the same witnesses' testimony to the contrary, do we understand how defendant's counsel can contend that the evidence shows contributory negligence, as a matter of law. It was conceded that the steel was proper for making the softhead, and it was for the jury to say, under the testimony of Zimmerschied, whether the excess of phosphorus, or the hardening of the head by hammering, had anything to do with the accident. If they gave credit to his testimony, and found that leaving the temper in the softhead was the cause of plaintiff's injuries, it would naturally follow that the negligence was defendant's, since it was responsible for the negligence of its blacksmiths, to whom it had committed its duty of furnishing safe tools to its employés.

We do not think the court would have been justified in instructing the jury, as a matter of law, that plaintiff assumed the risk of a defect in the softhead which required a chemical and microscopical examination to disclose. While the testimony indicates that the flying of chips is not unusual, the testimony also justifies an inference that such flying of chips is due to foul blows, and that in case of a fair blow, such as plaintiff and Zybach testified he struck, there was no danger in that regard, with a proper softhead.

2. The contention that the verdict was against the weight of the evidence requires no further consideration.

3. There was testimony by the plaintiff and his physician that the loss of the eye affected his ability to do his work, which would seem to be almost self-evident. Whether the performance of his work and the amount earned by the plaintiff after the injury disproved his testimony, were questions properly submitted to the jury. The verdict was a very moderate one under the circumstances, and not an unreasonable compensation for plaintiff's loss, independent of any diminution of earning power.

4. We are satisfied that the remarks of counsel were not sufficiently prejudicial to warrant us in reversing the case upon that ground.

5. It is contended that the court erred in withdrawing a portion of his charge, as follows:

"Gentlemen of the jury: I stated to you in one place: 'Defendant did not owe plaintiff the duty of furnishing a reasonably safe tool, but only the duty to use reasonable care to furnish a reasonably safe tool.' I think that puts in the case a distinction too fine to be considered, and I withdraw that part. But I leave all of the other part to stand, and not affected by what I say in withdrawing it."

If this action on the part of the court was erroneous, it was without prejudice. The defendant was manufacturing the tools itself. Its duty was an absolute one, which it could not delegate to an employé so as to escape liability

for negligence in its performance. The plaintiff's entire case rested upon the proposition that the blacksmith left temper in the softhead, and the evidence was conclusive that, if he did, this was negligence. The negligence of the blacksmith was the negligence of the defendant, and must have been found to exist.

6. A softhead was introduced in evidence, which plaintiff testified he picked out "because it was a good hammer; I used it. You wanted a good hammer. I brought it up as a sample of the hammer I found to be all right." This softhead was marked "Exhibit B," while the one plaintiff was using at the time he was injured was marked "Exhibit A." Both hammers were subjected to chemical and microscopical tests, and testimony given by Mr. Zimmerschied as to the results. Photographs of sections of the hammers, enlarged 100 and 1,000 diameters, were also received in evidence, as well as a similar photograph marked "Exhibit E."

"The piece of steel from which that photograph was taken is not a part of either of the hammers offered in evidence here. The object of making that picture was to show a typical structure in annealed steel. By 'annealed steel' I mean one which has been slowly cooled from a temperature above 850° in the case of carbon steel. When a piece of steel is subjected to that treatment, it will give the softest material capable of being yielded by that chemical composition."

We think the exhibits were properly admitted in evidence for the purpose of explaining and illustrating the witness' testimony, and enabling the jury to understand the character of his microscopical tests and the basis of his opinion. The trial judge protected the defendant against any harmful inference that might be drawn from the comparison of the exhibits by giving defendant's request to charge as follows:

"Plaintiff is not entitled to a verdict merely because the tool which is claimed to have caused his injury may be harder than some other tool or piece of metal. The ques-

156 Mich.—14.

tion to decide is not whether this tool is harder or softer than some other tool or some other piece of metal, but is whether it is reasonably safe. It might be harder than some other tool and still be reasonably safe, and in that case defendant is not liable. It is undisputed that it would not be practicable to make such tools of the softest possible metal, and that some variation in hardness is proper and usual. I therefore charge you that defendant was under no obligation to make this tool as soft as possible, or as soft as some other tool, and you cannot give plaintiff a verdict merely because it could have been made softer or because it is not as soft as some other tool, even if you find that to be the fact."

9. Plaintiff was permitted to testify that a tool that was not hard would not chip. Any injurious effect which might have resulted from this testimony was obviated by the giving of defendant's third request instructing the jury to disregard it. The witness Zybach was asked:

"How do you tell whether or not the steel in the head of the softhead is hard or soft?"

Against objection he was permitted to answer:

"You can tell by using it if there is no chip flying from it and it flattens down; that is the only way I can judge."

On cross-examination the witness testified that he did not know anything about steel. Doubtless, if the court's attention had been called to this testimony later on, he would have taken the same course as with plaintiff's. In view of the direction to disregard plaintiff's opinion, we do not think the jury could have attached any importance to Zybach's opinion.

We have examined the other points raised, are of the opinion that they are not well founded, and the judgment is affirmed.

GRANT, HOOKER, MOORE, and MCALVAY, JJ., concurred.